IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Audrey Johnson-Romaker,                                    Case No. 3:07CV3271

       Plaintiff

    v.                                                                      ORDER

Kroger Limited Partnership One,

       Defendant

      This is a case about alleged employment discrimination. Plaintiff, Audrey Johnson-Romaker alleges that defendant, Kroger Limited Partnership One [Kroger], violated Title VII and O.R.C. § 4112.99. She claims Kroger denied her cross-training opportunities and terminated her employment due to racial discrimination and in retaliation for complaining to the regional store manager of racist comments made by co-workers. Jurisdiction exists under 28 U.S.C. § 1331.

      Pending is Kroger's motion for summary judgment [Doc. 24] on all of Johnson-Romaker's claims: 1) Title VII Race/Color Discrimination; 2) Title VII Retaliation; 3) O.R.C. § 4112.99 Race/Color Discrimination; and 4) O.R.C. § 4112.99 Retaliation. For the following reasons, I shall grant Kroger summary judgment.

1

## Background

Johnson-Romaker began her employment with Kroger Store No. 936 in Defiance, Ohio, in 1998. She worked for Kroger until Kroger fired her in August, 2006. At the time of termination, Johnson-Romaker worked as a cashier. For the final two years of her employment with Kroger Store No. 936, Johnson-Romaker was the only black African-American employee.

Sometime in early 2006, Johnson-Romaker complained to Chad Doty, Kroger's regional manager, of racist comments made by co-workers. In late 2005, she heard co-workers tell a racist joke. The day after she heard the racist joke, one of her co-workers asked her to repeat the joke.[1]

Doty responded that Kroger has no tolerance for that behavior and he would inform the store manager, Alice Shutt. Shutt did not issue the offending employees constructive advice records, but Kroger provides undated handwritten records indicating Shutt warned the employees that racist comments were "unacceptable" and similar conduct in the future could result in their termination. [Doc. 24, Exh. 10]. The notes include the signatures of the offending employees. No one at Kroger, however, discussed the matter further with Johnson-Romaker, or explained to her that management had taken corrective action in response to her complaint.

On August 11, 2006, Johnson-Romaker reported to work at about 8:00 am. Around noon, she developed a migraine, and determined she could no longer continue working. She informed

---

[1] Johnson-Romaker alleges co-workers made other racist comments against African-Americans prior to and during 2003. She never informed her managers of these comments. In her reply to Kroger's summary judgment motion, she states that racist comments combined with Kroger's denial of cross-training requests created a hostile work environment (although she never raised this claim in her complaint). She cannot succeed on this claim because she never alleges the "harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment." *Ejikeme v. Violet* 2009 WL 161621, at *4 (6th Cir.) (listing elements of Title VII hostile work environment claim). I therefore overrule her hostile work environment claim.

2

Heather Lynd, office person/ floor supervisor, and Rebecca Church, office person/ head cashier, that she felt sick and needed to leave work early.[2] On her way home, Johnson-Romaker stopped at a store to purchase a new showerhead for her home so she could take a shower when she arrived at home.

After Church informed Shutt that Johnson-Romaker had not returned to work after her lunch break, Shutt called her at home, but could not reach her. She left a message with someone at Johnson-Romaker's home. Johnson-Romaker did not return her phone call that day.

Believing that Johnson-Romaker had not complied with store policies regarding notice when leaving work early, Shutt consulted with Kroger's Human Resources Department regarding what disciplinary action she could take against plaintiff. She determined Johnson-Romaker violated the store rule regarding job abandonment because she left work early without informing a management level official.

On August 21, 2006, Ronald Meyer, co- manager, issued Johnson-Romaker a constructive advice record on Shutt's behalf, indefinitely suspending her for violating a known store rule. After Kroger denied Johnson-Romaker's grievance, Kroger converted her suspension to termination.

Johnson-Romaker alleges Kroger racially discriminated against her by denying her cross-training opportunities and terminating her for leaving work early without management permission. She claims she received harsher treatment than similarly situated non-African-American employees who left work early without notifying a management level official. According to Johnson-Romaker, Kroger terminated her in part because of her race/color and in retaliation for complaining to Chad Doty of racist comments made by co-workers.

---

[2]Johnson-Romaker states she informed Rebecca Church she was leaving early. Church denies Johnson-Romaker's assertion. [Doc. 24, Exh. G]. For purposes of this opinion, I assume that plaintiff notified Church that she was leaving early.

Kroger denies Johnson-Romaker's allegations.  It asserts Johnson-Romaker has failed to support a claim for racial discrimination or retaliation under Title VII and Ohio state law. According to Kroger, she cannot show race motivated the termination of her employment because she offers no evidence that similarly situated non-African-American employees received less stringent discipline after violating the job abandonment rule. She also cannot establish that similarly situated non-African-American employees enjoyed cross-training opportunities that prevented Kroger from cutting their hours.

### Standard of Review

I must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U .S. 317, 322 (1986). The moving party bears the initial burden of informing the district court of its motion's basis, and identifying the record's portions demonstrating the absence of a genuine issue of material fact. *Id.* at 323. The nonmoving party then "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)(quoting Fed.R.Civ.P. 56(e)). The nonmoving party cannot rest on its pleadings or merely reassert its previous allegations; rather, the nonmovant must show that there is more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of concrete evidentiary material in its position's support. *Celotex, supra*, 477 U.S. at 324.

In deciding the motion for summary judgment, I will accept the evidence of the nonmoving party as true, resolve all doubts against the nonmoving party, construe all evidence in the light most

favorable to the nonmoving party, and draw all inferences in the nonmoving party's favor. *Eastman Kodak Co. v. Image Technical Services.*, 504 U.S. 451, 456 (1992). I shall rule in favor of summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue of material fact exists and the law entitles the movant to summary judgment.

### Discussion

### 1. Title VII and O.R.C. § 4112.99 Race/Color Discrimination

The "Ohio Civil Rights Act mirrors Title VII in all relevant respects for [Johnson-Romaker's] discrimination and retaliation claims." *Lindsey v. Whirlpool Corp.*, 295 Fed. Appx. 758, 760 (6th Cir. 2008). Thus I  analyze her "claims exclusively under a Title VII analysis, with the understanding that [her] success or failure in establishing a right to relief under Title VII necessarily would entail the conclusion that [her] claims must either succeed or fail under Ohio law as well." *Id.* (citations omitted). *See, e.g., Russell v. University of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (plaintiff's Title VII and O.R.C. § 4112 racial discrimination claims could be analyzed together because "Ohio's requirements are the same as under federal law.") (citing *Carter v. Univ. of Toledo*, 349 F.3d 269, 272 (6th Cir.2003)).

Johnson-Romaker bases her Title VII and Ohio state discrimination claims on Kroger's denial of cross-training requests and termination of employment. She brings her claims under the mixed-motives framework. She alleges Kroger denied her requests for cross-training "at least in material part because of her race/color and because she complained of discrimination." [Doc. 1]. She similarly maintains Kroger terminated her employment "at least in material part, because of her race/color . . . and because she complained of discrimination." *Id.*

5

A plaintiff brings a mixed-motives claim when she alleges legitimate and illegitimate reasons motivated the employer's adverse employment action. *White v. Baxter*, 533 F.3d 381, 396 (6th Cir. 2008). To succeed on a mixed-motives claim, a plaintiff must produce evidence sufficient for a jury to conclude: 1) "defendant took an adverse employment action against the plaintiff; and 2) race, color, religion, sex, or national origin was *a* motivating factor for the . . . adverse employment action." *Id*. at 400. [emphasis in original].

The *McDonnell-Douglas* burden-shifting framework "does not apply to the summary judgment analysis of Title VII mixed-motive claims." *Id*. The Sixth Circuit explained courts use the *McDonnell-Douglas* and pretext analysis to determine whether the defendant's "allegedly legitimate reason [really motivated] his actions." *Id*. at 401. With mixed-motive claims, however, the plaintiff need not eliminate possibly legitimate reasons for adverse employment actions. Plaintiff only needs to show that an illegitimate reason also motivated the employer's decision. *Id*. at 400 - 02.

The mixed-motives analysis lowers the burden for plaintiffs:

> The burden of producing some evidence in support of a mixed-motive claim is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim. . . . In order to reach a jury, the plaintiff is not required to eliminate or rebut all the possible legitimate motivations of the defendant as long as the plaintiff can demonstrate that an illegitimate discriminatory animus factored into the defendant's decision to take the adverse employment action.

*Id*. at 400 - 01.

The Sixth Circuit suggested a Title VII plaintiff could use parts of the *McDonnell-Douglas* framework to support a mixed-motives claim. *Id*. at 401. Ultimately, however,

> [T]he only question that a court need ask in determining whether the plaintiff is entitled to submit his claim to a jury in such cases is whether the plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance

of the evidence, that race, color, religion, sex, or national origin was a motivating factor for the defendant's adverse employment decision.

*Id.* (citation omitted).

I must therefore determine whether a reasonable jury could conclude Kroger took  adverse employment actions against Johnson-Romaker, motivated in part by racial animus.

## A. Requests for Cross-Training

Kroger argues Johnson-Romaker cannot depend on denial of her requests for cross-training to support her racial discrimination claim. She made her first request in 2002 and her last request in 2006.

A plaintiff who first files an EEOC charge with a state or local agency must file it within 300 days of the alleged discriminatory event. 42 U.S.C. § 2000e-5. Johnson-Romaker, therefore, can only rely on discriminatory incidents that took place 300 days prior to her filing on August 23, 2006, to support her discrimination and retaliation claims. She cannot rely on the denial of her cross-training requests in 2002 or in 2005, because she does not specify the date in 2005 on which this denial took place.

Johnson-Romaker responds that under Ohio state law, the statute of limitations is six years, so she can depend on the denial of cross-training requests she made in 2002 and 2003. She adds she can also rely on denial of cross-training requests under Title VII because she made her last request for cross-training in 2006. [Doc. 29-6].

Johnson-Romaker cannot successfully show race/color discrimination on the basis of management's denial of cross-training requests, even if she made her last requests within the period of limitations under Title VII or the Ohio statute. She fails to demonstrate Kroger's denial of cross-training requests constitutes an adverse employment action.

7

The Sixth Circuit defines an adverse employment action as "a materially adverse change in the terms and conditions of plaintiff's employment." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 575 (6th Cir. 2004). "An employee need not have suffered one of the ultimate employment actions . . . to have a viable claim of discrimination. A material adverse action may consist of a less distinguished title, diminished options for advancement, or other unique indices." *Freeman v. Potter*, 200 Fed. Appx. 439, 442 (6th Cir. 2006). To determine whether an employment action is materially adverse, I must consider "objective factors, not subjective impressions." *Id*. at 442-43.

Johnson-Romaker explains she requested cross-training because cross-training would have allowed her to move from part-time to full-time employment at Kroger, and thus, she would have had increased hours, pay and job security. Actions preventing an employee from moving from part-time to full-time employment constitute adverse employment actions, especially since full-time status would lead to greater pay and opportunities for advancement. *Id*. at 442 (material adverse change includes diminished opportunities for advancement); *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006) ("Denial of training can constitute an adverse employment action where it bears on either plaintiff's opportunities for professional growth and career advancement or directly on plaintiff's compensation"); *Carter v. University of South Alabama Children's & Women's Hosp.*, 510 F. Supp. 2d 596, 609 (S.D. Ala. 2007) (denial of application for different position with increased work hours constitutes materially adverse action).

In this case, however, Johnson-Romaker states in her affidavit that in mid-2004 she received permission to go from part-time to full-time. The lack of cross-training therefore, did not prevent her from gaining full-time employment at Kroger. [Doc. 29, Exh. 2]. She also admits that in 2004 her former manager, Anna Sprow, granted one of her requests for cross-training in the office.

8

Johnson-Romaker chose to end the cross-training in the office because she believed her supervisor did not trust her.

Johnson-Romaker continued to request cross-training because even after going full time, her hours were sometimes still cut. She stated, "By being trained to work in several different departments there was a better chance I would not have my hours cut." *Id.* She claims Kroger provided cross-training to other non-African-American employees, but denied her requests.

Kroger insists Johnson-Romaker offers only her conclusory impression that receiving cross-training would lead to greater hours. It states that hours depended on seniority and not cross-training, and points to the Collective Bargaining Agreement, Article 9: "Employees hired after November 14, 1989 will be entitled to the week's schedule of work with the most hours within their department in accordance with their seniority, availability and availability to perform the work required." The fact that hours depend in part on an employee's "ability to perform the work required" indicates that cross-training would lead to greater hours.

Johnson-Romaker's claim based on cross-training fails, however, because she does not provide any evidence that Kroger would refrain from occasionally cutting her hours if she received cross-training. She does not give examples of non-African-American employees who avoided having their hours cut because Kroger granted their cross-training requests. Nor does she explain why cross-training would prevent Kroger from occasionally cutting her hours. Because Johnson-Romaker does not demonstrate that denial of cross-training constituted an adverse employment action against her, she cannot base her discrimination claim on Kroger's denial of her cross-training requests.

### B. Termination of Employment

Johnson-Romaker also relies on Kroger's termination of her employment as a basis for her claim of racial discrimination. She alleges racial animus partly motivated her termination.

Johnson-Romaker successfully demonstrates the first element of her mixed-motive claim: termination constitutes an adverse employment action. *Smith, supra* 378 F.3d at 575.

She must also present enough evidence to convince a jury that race played a role in Kroger's decision to terminate her employment. Kroger contends she must rely on the *McDonnell-Douglas* framework because she supports her mixed-motives claim with circumstantial evidence. Such a conclusion, however, contradicts the Sixth Circuit's decision in *White, supra*, 533 F.3d at 400 (holding the mixed-motive analysis, rather than the *McDonnell-Douglas* burden shifting framework, should be "applied in all Title VII mixed-motive cases regardless of the type of proof presented by the plaintiff.").

Johnson-Romaker, however, must still establish a prima facie case by demonstrating race played a role in Kroger's decision to terminate her employment. She argues racial animus partly motivated Kroger because the job abandonment rule described by management was not actually practiced or enforced, and she received harsher discipline than non-African-American employees who left work early without management permission.

Kroger asserts it informed all its employees of the "job abandonment" rule. Alice Shutt, Ronald Meyer and Heather Church describe the rule in their affidavits. They point to the Employee Handbook Rule & Regulations section, which begins, "Committing any of the following violations will be sufficient grounds for disciplinary action ranging from reprimand to immediate discharge, depending on the seriousness of the offense in the judgment of management." Number nine in the

list of thirty-eight violations states, "Leaving the work area during working hours without permission (job abandonment)."

Alice Shutt, Ronald Meyer and Heather Church testify in their affidavits that according to Kroger's store rules, any employee who wants to leave work early due to illness or for any other reason must obtain permission from the store manager or co-manager. An employee could seek permission from the department head only if the manager or co-manager was unavailable. The job abandonment rule in the employee handbook states an employee must obtain permission to leave early, but does not specify from whom the employee must obtain permission, or the seniority level of Kroger employees from whom they should seek permission. It merely lists "leaving the work area during working hours without permission" as one example of conduct that could warrant some type of discipline.

Johnson-Romaker suggests management's version of the job abandonment rule did not actually exist in the day-to-day operations of the store. Her deposition transcript records the following exchange:

> Q. Aren't you supposed to tell management when you have to leave work?
> A. I don't know that.
> Q. How long have you worked at Kroger; 10 years?
> A. Yes.
> Q. And are you saying that it was okay for you to tell another bargaining unit employee that you were leaving the job and leaving your shift early as opposed to telling management; is that what you're telling me?
> A. That was past practice. That's the way they did it.

[Doc. 30].

Additionally, she stated in her affidavit,

> [I]t was not necessary that I speak with the manager on duty even if she was not in her office because the policy in effect at the time was that if you get sick at work you can leave as long as you tell the person in the office you are sick and leaving. I did

11

not abandon my job. I followed the proper procedure in effect at the time in leaving work on August 11, 2006.

[Doc. 29, Exh. 2].

Johnson-Romaker provides an affidavit of a co-worker, Dawn Baldridge, to support her position that Kroger's rules did not require her to request permission from management to leave during working hours because of her illness. Baldridge states in her affidavit,

> I was not aware of any written policy regarding what an employee does if he/she becomes ill at work. My understanding of the policy is that if an employee becomes ill at work, the employee reports his/her illness to the head office person. Once the employee does this, he/she has the right to leave work due to their sickness. In the meantime, the head office person is supposed to report the illness to the manager or store person in charge.

[Doc.29, Exh. 3].

Kroger denies Johnson-Romaker and Baldridge's contentions. It points to copies of Johnson-Romaker's acknowledgment of receipt of the policy manual as evidence that she knew of the requirement to obtain permission from management.

The vagueness of the manual's terms favors Johnson-Romaker, especially because in other sections the manual specifies that employees must receive permission from management. For example, included in the same list as the job abandonment rule is, "26. Failure to notify management, at least two hours before scheduled starting time, when absent or unable to report to work as scheduled" [is cause for disciplinary action up to discharge]. In another section, the handbook states:

> F: If, for any reason, you are unable to report for work as scheduled, the **Store Management** must be notified as early as possible, at least two (2) hours in advance of your shift. Frequent absence and/or tardiness disrupts store conditions and lowers ASSOCIATE morale, therefore . . .   **FAILURE TO NOTIFY STORE MANAGEMENT CONCERNING ABSENCE FOR 3 CONSECUTIVE**

12

**SCHEDULED DAYS WILL RESULT IN ASSOCIATE SEPARATION AS A VOLUNTARY RESIGNATION**.

[Emphasis in original].

The ambiguity of the job abandonment rule tends to support Johnson-Romaker's position regarding its relevance and enforcement of the rule. She, however, does not provide evidence to support an inference that race played a role in Kroger's decision to terminate her because she fails to show that similarly situated non-African-American employees were punished less severely for similar misconduct. *See, e.g., Lindsey v. Whirlpool Corporation*, 295 Fed. Appx. 758, 768 (6th Cir. 2008) (finding plaintiff had not "explained how [non-protected] employees were similarly situated to her so as to justify an inference that her disparate treatment was based upon her race.").

Johnson-Romaker proffers constructive advice records that describe disciplinary measures taken against Kroger employees while she served as a union steward. None of these records, however, were issued due to the employees' violation of the job abandonment rule. Instead, Kroger disciplined these employees for not coming into work as scheduled, or for leaving work before their shift ended, after receiving permission from management. These employees violated Kroger's absenteeism policy, not its job abandonment rule.

Johnson-Romaker provides a constructive advice record for Dan Orr, a Kroger employee. The record indicates Kroger disciplined Orr for starting work before his shift actually began, and clocking out later than it ended. [Doc. 30, Exh. 19].

She includes three constructive advice records for Marta Dunderman. According to the constructive advice record issued to Dunderman on November 4, 2002,

> On the following dates Marta was scheduled to work and did not work the scheduled shift:

13

5/17/02 - left 2hrs 49min early
6/22/02 - left 40 minutes early
6/08/02 - scheduled 6-10:30, called in
6/09/02 - scheduled 6-10 pm, called in
7/14/02 - scheduled 1:20 - 10pm called in
7/15/02 scheduled 3:30 - 10pm called in
8/11/02 1 hr 25 min late
8/27/02 scheduled 5:15 - 10:15 pm
9/02/02 scheduled 3:30-10 pm called in
9/05/02 scheduled 6-11 pm called in
9/11/02 scheduled 2:30-10:30 pm called in
9/15/02 left 1 hr 13 minutes early
9/22/02 scheduled 9:45pm - 6:15 am called in
9/28/02, 5-10 called
10/08/02 4-10:30
10/20/02 3:30 - 10
10/21/02
11/02/02 (illegible) called in

Kroger gave Dunderman a one day suspension and sixty day probation. The record warns,

"[f]uture occurrences will result in further disciplinary actions up to and including discharge." [Doc.

30, Exh. 21].

Johnson-Romaker presents two more constructive advice records issued to Dunderman. The

one issued February 8, 2003, states,

On the following dates Marta was scheduled and did not work her scheduled shifts:

1-10-03 scheduled 3-10:30pm, called in
1-31-03 scheduled 4:30-11:pm, worked 4:30-7:57pm, Left 3 hours early
2-02-03 scheduled 2:45 - 8:45 pm, called in
2-04-03 scheduled 4:30 - 8:30 pm, called in
2-05-03 scheduled 2-10pm, called in

The advice record notes Dunderman's prior warning and places her on a sixty day probation.

It concludes, "future occurrences will result in further disciplinary actions up to and including

discharge." Anna Sprow, previous store manager, signed the record. *Id.*

14

The third constructive advice record issued to Dunderman in April, 2003 states, "Marta did not work her scheduled shifts on 4/13, 4/18 and 4/19 and 4/20. These were on consecutive scheduled days. She also missed on 4/7 and left early on 3/16." It again notes Marta's previous warnings for similar misconduct. It mentions Marta's placement on probation effective February 8th, and places her on a sixty day probation. Ronald Meyer, co-manager, signed this record. *Id.*

Johnson-Romaker points to the constructive advice record of Larry Rivera, issued on December 4, 2002. It states, "Larry didn't work his scheduled shifts on 10/24, 11/2 and 11/30." Kroger placed him on a sixty day probation. Ronald Meyer signed the record. A second constructive advice record for Larry Rivera, issued April 15, 2003 states,

On the following dates Larry did not work his scheduled shifts:

Thurs 1-02-3, scheduled 12:30 called in
Sun 1-05-03 scheduled 10-6:30 am, left 7.5 hours early
2/12/03 - left work 4 hours early
2-21-03 - left work 3 hours 44 min early
2-23-03 - scheduled 10pm-6:30am called in
3-14 scheduled 9-5:30 called in
3-16 left work 5 hrs 30 min early
4-12 scheduled 10pm-6:30am called in

The form notes Larry had previously received notice and warning regarding Kroger's absenteeism policy, and as a corrective effort, Kroger placed him on a sixty-day probation. Ronald Meyer, co-manager, signed the form. [Doc. 30, Exh. 20].

Johnson-Romaker presents the advice record issued to Aaron Alvarado on June 27, 2003. It states, "Aaron did not work his scheduled shifts on 4/30/03, 5/11/03 and 6/7/03. Aaron also left early on 6/24 - scheduled till 5:30am he left at 1:54am." It warns that another miss will result in a one day suspension if the miss occurs within the next sixty days. Ronald Meyer signed the record. [Doc. 30, Exh. 17].

15

Johnson-Romaker seeks to demonstrate *via* the constructive advice records of non-African-American employees that racial animus played a role in her termination. The Sixth Circuit has held:

> [I]t is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the comparables are similarly-situated in all respects. . . . [T]o be deemed similarly-situated, the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Mitchell v. Toledo*, 964 F.2d 577, 583 (6th Cir.1992).

In *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998), the Sixth Circuit clarified its holding in *Mitchell* by stating that a discrimination plaintiff need not show the parties are identical with regard to each aspect of employment. Rather a plaintiff must show that she and the non-minority employees are comparable in all relevant respects. *Id.* at 352.

Kroger reasons the non-African-American employees who received constructive advice records differ from Johnson-Romaker because different supervisors determined the discipline those employees received and those employees violated Kroger's absenteeism policy as opposed to its job abandonment rule.

Ronald Meyer, co-manager of Kroger since 1986, explains employees receive discipline under the absenteeism policy when they obtain management permission to either not come into work, or to leave early. He asserts that no employee under his supervision has ever left work early without permission from management, and that if an employee ever did do this, he would terminate his employment.[3] [Doc. 24, Exh. C].

---

[3]Johnson-Romaker, in her deposition, states she did not know of the rule regarding job abandonment. She admits, however, that as a union steward she was aware of individuals who

The protected plaintiff and non-protected employees do not have to have committed the same alleged misconduct to be comparable. Instead, they must "have engaged in acts of comparable seriousness." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006). *See also Corell v. CSX Transportation*, 2008 WL 4683439, at * 7 (E.D. Mich.). The question then becomes whether violations of the absenteeism policy are of comparable seriousness to violations of the job abandonment rule. The underlying difference between the two rules is that employees who violated the job abandonment rule have not requested permission to leave work from management. Kroger can choose to punish violations of the job abandonment rule more severely than it punishes violations of its absenteeism policy on that basis. *See, e.g., Graham v. Best Buy Stores, L.P.*, 298 Fed. Appx. 487, 495 (6th Cir. 2008) (affirming Best Buy could choose to have a policy that treated one type of misconduct more harshly than another).

Johnson-Romaker fails to overcome Kroger's distinction between her violation and those of co-workers given lesser punishments. She offers no more than conclusory assertions that other employees left early without management permission.[4]

---

Kroger disciplined because they left early without management permission. [Doc. 30]. Her testimony contradicts Ronald Meyer's affidavit in which he posits that since he became a co-manager no one under his supervision has violated the job abandonment rule by leaving work early without permission from management. Johnson-Romaker, however, does not provide examples of non-African-American employees receiving lesser discipline for a violation of the job abandonment rule.

[4] In her affidavit, current Kroger employee Dawn Baldridge admits that she has left early on occasion without management permission. She also lists other employees who she alleges leave work early without management permission. Alice Shutt responds she had no knowledge of Baldridge's violation of the job abandonment rule, and would have disciplined her if she had known of her violation. She adds that office employees had her permission to leave early when they completed their work prior to the end of their scheduled shift. She allowed this because those employees do not deal with customers.

Johnson-Romaker fails to proffer examples of non-African-American employees who committed job abandonment and received less stringent discipline.[5] She therefore does not provide enough evidence to support a conclusion that racial animus constituted a motivating factor behind her termination.

## 2. Title VII and O.R.C. § 4112.99 Retaliation

---

[5]In response to Johnson-Romaker's contention that the comparable Kroger employees left work early without management permission, Kroger insists they obtained permission and adds even if they had not received permission, they would not be comparable to Johnson-Romaker because Ronald Meyer and/or Anna Sprow meted out discipline in those cases. Here Meyer only gave Johnson-Romaker the constructive advice form. Alice Shutt, the new store manager, made the final decision to terminate Johnson-Romaker's employment after consulting Kroger's Human Resources Department.

The Sixth Circuit has held the supervisor of non-protected employees does not have to be the same as that of the plaintiff for the non-protected employees to be comparable to the plaintiff. It considers the parties comparable if they shared an ultimate supervisor, or if similar people participated in the disciplinary processes of both the protected and non-protected employees, so that all those involved would have knowledge of the discipline administered to non-protected employees in the past. *See, e.g., Seay v. Tennessee Valley Authority, 339 F.3d 454, 479 (6th Cir. 2003)* ("[T]he same supervisor criterium has never been read as an inflexible requirement. . . . A plaintiff need not demonstrate an exact correlation . . ." Here the court found comparability where "all of the people involved in the decision-making process, including plaintiff's immediate supervisor and the department manager were well-aware of the discipline" administered to past violators); *King v. State of Ohio,* 2009 WL 73875 (S.D. Ohio) (plaintiff not comparable to non-protected employees where different decision makers were *not* part of the same decision-making process); *McMillan v. Castro,* 405 F.3d 405, 414 (6th Cir. 2005) ("requirement that a plaintiff and her comparator must have dealt with the same supervisor . . . does not automatically apply in every employment discrimination case. Whether that criterion is relevant depends upon the facts and circumstances of each individual case.").

In this case, Ronald Meyer had been co-manager of Kroger since 1986. He, along with Kroger's Human Resources Department, would have been involved in the disciplinary processes of non-protected employees prior to the arrival of Alice Shutt. They also participated in the decision-making/disciplinary process administered to Johnson-Romaker. Meyer and Kroger's Human Resources Department knew and had the ability to inform Alice Shutt of the types of discipline given to previous violators of the job abandonment rule. Kroger cannot rely on the existence of a new supervisor to avoid any responsibility for treating employees of protected groups more harshly than white employees. While a change in managers can suggest a legitimate reason for disparate treatment, "a change in managers is not a defense to claims of race or sex discrimination." *Cooper v. City of N. Olmstead,* 795 F.2d 1265, 1271 (6th Cir. 1986).

18

Johnson-Romaker brings a retaliation claim under Title VII and O.R.C. § 4112.99. She alleges Kroger discharged her because she complained to Chad Doty, regional manager of Kroger, that co-workers made racist comments. In response, Kroger first argues that Johnson-Romaker cannot bring the retaliation claim under Title VII because she did not check the retaliation block on her charge of discrimination, and therefore did not exhaust her administrative remedies.

A plaintiff may file a suit only on the basis of claims raised in the EEOC charge, or expected to grow out of an EEOC investigation. *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 379 (6th Cir. 2002). "Under this scope of investigation test, a plaintiff may fully exhaust administrative remedies on a claim 'where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim.'" *Id*. at 380.

The Sixth Circuit has held "retaliation naturally grows out of any underlying substantive discrimination charge, making a retaliation claim foreseeable to defendants." *Duggins v. Steak N' Shake*, 195 F.3d 828, 833 (6th Cir. 1999). In addition, if plaintiff filled out the EEOC charge on her own [which appears to be the case here], the Sixth Circuit stated "a lay complainant should not be precluded from bringing suit because of the failure of a complainant to attach the correct legal conclusion to the EEOC claim . . ." *Id.* (citations omitted). In this case, Johnson-Romaker failed to make a retaliation claim on her EEOC charge, but alleged facts such as "talked to regional manager" in addition to her general discrimination claims that could support an EEOC investigation of a retaliation claim.

Johnson-Romaker may also still assert her retaliation claim under O.R.C. § 4112.99. Absent direct evidence, however, she must establish a prima facie retaliation claim under the *McDonnell-Douglas* framework. *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir.2003). She must

19

produce evidence that "1) [she] engaged in protected activity; 2) the employer knew of the exercise of the protected right; 3) an adverse employment action was subsequently taken against [her]; and 4) there was a causal connection between the protected activity and the adverse employment action." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 420 (6th Cir. 2008).

To establish a causal connection, Johnson-Romaker must "adduce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken if [she] had not engaged in protected activity." *Hout v. City of Mansfield*, 550 F. Supp. 2d 701, 730-31 (N.D. Ohio 2008) (citation omitted). "There is no one dispositive factor required to establish a causal connection; however, evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Id.*

Johnson-Romaker fails to demonstrate temporal proximity between her complaints to Chad Doty and her discharge. She speculates Chad Doty informed Alice Shutt of her complaints six to seven months before her discharge, but fails to produce evidence to support this assumption. Her discharge came approximately eight months after her complaints to Chad Doty. While no one factor is dispositive, temporal proximity is the only evidence she presents to support her retaliation claim. *See Cooper v. City of N. Olmstead*, 795 F.2d 1265, 1272-73 (6th Cir.1986) ("mere fact that [plaintiff] was discharged four months after filing a discrimination claim," absent other evidence of retaliation, could not support inference of retaliation).

As discussed in the Title VII racial discrimination claim analysis, Johnson-Romaker fails to introduce evidence that Kroger treated her differently from similarly situated non-African-American employees. *See supra* Section1.B. Her retaliation claim, therefore, fails.

20

**Conclusion**

For the foregoing reasons, it is hereby:

ORDERED THAT defendant Kroger's motion for summary judgment [Doc. 24] be, and the same hereby is granted.

So ordered.

s/James G. Carr  
James G. Carr  
Chief Judge
